IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 7, 2021

## STATE OF TENNESSEE v. KEVVON CLARK

**Appeal from the Criminal Court for Shelby County**
**No. 18-00185    Paula Skahan, Judge**

_____

### No. W2020-01036-CCA-R3-CD
_____

The Defendant, Kevvon Clark, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder; first degree felony murder; two counts of especially aggravated kidnapping, a Class A felony; aggravated rape, a Class A felony; and aggravated robbery, a Class B felony, for which he is serving an effective life sentence. *See* T.C.A. §§ 39-13-202 (2018) (subsequently amended) (first degree murder), 39-13-305 (2018) (especially aggravated kidnapping), 39-13-502 (2018) (subsequently amended) (aggravated rape), 39-13-402 (2018) (aggravated robbery).  On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions for first degree murder, one count of especially aggravated kidnapping, and aggravated rape, and (2) this court should grant relief, as a matter of plain error, from the trial court's failure to give a jury instruction in accord with *State v. White*, 362 S.W.3d 559 (Tenn. 2012).  We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Michael E. Scholl (on appeal); Monica Timmerman (at trial); and James Jones (at trial), Memphis, Tennessee, for the appellant, Kevvon Clark.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; Eric Christanson and Dru Carpenter, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to crimes that he and his codefendant, Jermarcus Thomas, perpetrated against Luis Santiago, to whom we will refer as the homicide victim, and another victim, to whom we will refer as the rape victim, in accord with this court's policy not to identify by name the victims of sexual offenses. At the Defendant's trial, Mr. Thomas testified for the State.

At the trial, Mace Ellison testified that on March 30, 2017, she was outside her place of employment, which was near a parking lot, an empty lot, and an abandoned building. She identified photographs of the area, which were received as exhibits. She said that she heard a man scream and that seconds later, she heard a sound she thought was a gunshot. She said that she called 9-1-1, that the dispatcher told her to call a non-emergency number because Ms. Ellison did not know the address of the abandoned building, and that she called the number. She said a police officer interviewed her a day or two later.

Memphis Police Detective Christopher Parker testified that on March 31, 2017, he and other officers searched for the Defendant, who was a criminal suspect, in the area where the Defendant had last been seen. Detective Parker said that the homicide victim was missing at the time. Detective Parker said that he drove up a hill on a curvy road and saw a man's body next to a truck. Photographs of the body and the truck were received as exhibits. He noticed dried blood on the back of the head of the body and said the hands were bound in the front.

Memphis Police Crime Scene Investigator Tristan Brown testified that he responded to the scene where the body was found on March 31, 2017. He identified a diagram he drew of the scene, which was received as an exhibit. He identified photographs he took at the scene, and the photographs were received as exhibits.

Acting Chief Medical Examiner Dr. Marco Ross, an expert in forensic pathology, testified that Dr. Zachary O'Neal performed the autopsy of the homicide victim's body. Dr. Ross said he had reviewed the records created by Dr. O'Neal. Dr. Ross said the homicide cause of death was a gunshot wound to the head and that the manner of death was homicide. Dr. Ross identified photographs of the wound, which were received as exhibits. He said that the homicide victim had a gunshot wound on the upper back of the head that perforated the brain and that bullet fragments were recovered from inside the head. He said that the bullet had been fired from an indeterminate range and that the wound was a "non-contact wound." He said the bullet had traveled at a downward trajectory that was consistent with the homicide victim's having knelt with his head

-2-

bowed with the shooter having been positioned in front of the homicide victim and having shot downward. He thought the on-scene investigator had noted gravel and dirt on the homicide victim's knees.

Dr. Ross identified a photograph of the homicide victim's personal effects collected during the autopsy. Dr. Ross said the items were a wallet, "miscellaneous cards and papers," $0.76 in United States currency, a Mexican peso, and a lighter. He said the homicide victim's blood alcohol level was .041 percent.

Lavonda Jones testified that on March 30, 2017, around 2:30 or 3:00 p.m., she was driving when she saw an erratically driven white truck turn in front of her. She said the truck had an enclosed back with a vertical door, which opened. She said that she saw a person's hand "waving and flagging" and that she called 9-1-1. Ms. Jones said that she followed the truck to try to get the license plate number. She said that when the truck and her car were stopped at a red light, a young woman, whom other evidence showed was the rape victim, dashed from the back of the truck. Ms. Jones said the rape victim screamed, appeared "terrified," and begged Ms. Jones to open her car door. Ms. Jones said the rape victim stated, "[I]f you don't let me in, they're going to kill me." Ms. Jones identified photographs of the truck and the rape victim, and the photographs were received as exhibits.

Ms. Jones testified that she allowed the rape victim to get into her car, that she tried to calm the rape victim, and that she asked the rape victim questions and relayed the information to the 9-1-1 operator. Ms. Jones said she noticed red coloration on the rape victim's arms and wrists, which "looked as if, at some point, [the rape victim] was bound."

Ms. Jones testified that the rape victim said she and a male relative had been abducted from the rape victim's home. Ms. Jones said the rape victim stated that the male relative was still in the truck with "two young men," whom she said planned to take the male relative to the bank. Ms. Jones said the rape victim stated that she knew the men who had abducted her and the male relative and that the abductors were related to a man who lived in the boarding house where the rape victim lived. Ms. Jones said the rape victim identified one of the abductors as "Tavaris."

Ms. Jones testified that she stopped following the truck, in accord with instructions from the 9-1-1 operator, and that she drove to a police precinct. She said she spoke with officers and left the rape victim there.

Shelby County Crime Victims and Rape Crisis Center Nursing Coordinator Kristine Gable testified that her employment duties included serving as a records custodian. She said the rape victim was examined by another employee, Sally D'Senza, on March 30, 2017, at 5:45 p.m. Ms. Gable had reviewed Ms. D'Sensa's records related to the rape victim's examination. Ms. Gable said the rape victim reported the following: Two men came into her home. One of the men was Tavaris, the landlord's seventeen-year-old nephew, and the other was "an unknown 17 year old." James Kenney, Tavaris's uncle, came in and asked "[W]hat's going on?" Tavaris told the rape victim and her male relative not to say anything and threatened them with a gun. The intruders forced the victims into the homicide victim's truck. The unknown seventeen-year-old drove the truck around the corner, and Tavaris told the driver to stop. The driver said he wanted oral sex and forced the rape victim to fellate him. The abductors tied the rape victim's hands behind her and made her get into the back of the truck. She repeatedly opened the back of the truck in order to draw attention and get help. When the truck stopped, she jumped out and ran. The rape victim cried and stated the abductors still had her male relative. The incident happened around 1:00 p.m. that day.

Ms. Gable testified that the rape victim had an irregular red abrasion on her right second finger. Ms. Gable said the rape victim's mouth was swabbed to collect any DNA evidence.

James Kenney testified that the Defendant was his "nephew step-son," and he identified the Defendant in the courtroom. Mr. Kenney said that the rape victim had rented a room from him and that he knew the homicide victim as a relative of the rape victim. He said the homicide victim visited the rape victim frequently and that the homicide victim usually gave him money for the rape victim's rent.

Mr. Kenney testified that on March 30, 2017, the rape victim was home and that the homicide victim came to visit the rape victim and to pay her rent. Mr. Kenney identified photographs of the exterior and interior of his house, which were received as exhibits. The exhibits included photographs of the rape victim's room. Mr. Keeney said that the Defendant asked him whether the rape victim was home and that the Defendant went to her room, where she and the homicide victim were. Mr. Kenney said the Defendant had a friend with him, who waited on the house's porch while the Defendant went to the rape victim's room. Mr. Kenney said the Defendant was in the room with the victims for ten to fifteen minutes. Mr. Kenney said he did not hear sounds from the room or notice anything. He said that while the Defendant was in the rape victim's room, Mr. Kenney sat on the couch watching a television show that began airing at noon. He said that the Defendant and the victims left the house together and that he never saw the victims again. Mr. Kenney did not see a gun and said it did not appear that the victims

were being forced out of the house at gunpoint. Mr. Kenney did not recall giving a previous statement in which he said he heard the homicide victim's truck start, and Mr. Kenney said he did not see the Defendant get into the homicide victim's truck. Mr. Kenney did not recall if the Defendant tried to contact him later that day.

Mr. Kenney testified that before March 30, 2017, the Defendant came to his house about every other day. Mr. Kenney said he had "not really" seen the Defendant interact with the rape victim before that day. He later said that he had seen the Defendant talk to the rape victim before March 30 and that it had not been unusual for the Defendant to have asked where she was on March 30.

The rape victim testified that the homicide victim had provided her with financial support. She said she had been using crack cocaine at the time. She acknowledged that she had theft convictions and that she had recently pleaded guilty to a "car jacking charge" but was now in a drug treatment program.

The rape victim testified that she used to buy drugs from the Defendant, whom she identified in the courtroom and whom she knew as Mr. Kenney's nephew. She said she had known him for about four or five months before March 30, 2017. She said the homicide victim always worked and had cash. She said that on March 30, she owed $100 to $200 to the Defendant and had told him she would repay him when she received an income tax refund. She said she and the Defendant had spoken about the debt but that "he wasn't really . . . sweating" her about it.

The rape victim testified that on the morning of March 30, 2017, she was in bed with bronchitis and had recently been hospitalized. She said the homicide victim came to pick her up to get medicine and food around "lunch time" and that they ran errands for thirty minutes to an hour before returning to her room at Mr. Kenney's house. She said that after thirty to forty-five minutes, the Defendant came into her room and demanded the homicide victim's wallet. She said he demanded money and did not say, "[W]here's the money you owe me?" She said the Defendant did not ask about the money for the drug debt and explained that he demanded money, "Not as in . . . where's the money you owe me, but as in where's the money you got." She said the Defendant held a flashlight and a long-barrel revolver, the latter of which he pointed at her and the homicide victim. She said she was caught off guard and was surprised. She said the homicide victim asked if she owed the Defendant money and that the homicide victim stated, "No problem, I'll pay you if she owes you money." She said the homicide victim, who had just cashed a check and had around $500, took out his wallet and gave it to the Defendant.

The rape victim testified that the Defendant put the gun under his shirt and "ushered" her and the homicide victim to the front of the house, where another "guy" she had seen once before was at the front door. She said they walked out in front of Mr. Kenney. She said that the abductors ushered the victims into the homicide victim's truck and that the abductor who had been on the porch drove the truck after the homicide victim surrendered his keys at gunpoint. She said the homicide victim had told Mr. Kenney that he did not want the abductor to drive the truck but that the homicide victim did not say they were being robbed and abducted because the Defendant had the gun under his shirt. She said that the homicide victim sat next to the driver, that the Defendant sat by the passenger door, and that she sat between the homicide victim and the Defendant. She said the abductors had bound her hands with tape but that it did not stick because the weather was rainy.

The rape victim testified that the driver pulled around the corner and stopped the truck. She said that when he noticed her hands were not bound by the tape, he tied her hands with a blue extension cord. She said the driver was about to take her out of the truck and put her in the back when he said, "F this, I want some head." She said she performed felatio on the driver. She said the Defendant placed her in the back of the truck. She said that the homicide victim had continued to say he would pay any money she owed the Defendant and that she did not see the abductors bind the homicide victim's hands. She said that she whispered to the homicide victim to run and that she did not know if the abductors planned to take the homicide victim to an automated teller machine. She said that neither she nor the homicide victim were "free to go" and that she had not wanted to perform oral sex on the driver. She said that the Defendant never verbally threatened her or the homicide victim but that he "had the gun on" them. She said the Defendant "wasn't saying much" but that he said, "Give me the money."

The rape victim testified that she opened the camper door on the back of the truck and "started flagging at people to call the police" when the truck made stops. She said that at one of the stops, she got out of the truck and got into a woman's car. She said that she was panicked and told the woman to follow the truck but that the 9-1-1 dispatcher told the woman to drive to a police precinct. The rape victim did not recall the name of one of the abductors that she told to the woman. She later acknowledged that she had told the woman that the driver's name was Tavaris and did not know why she had said this. She said she had been panicked. She said she had not known the driver's name. She said she had known the Defendant as "Key" at the time and learned his full name later. She thought she might have been trying to "figure out" the name when she was at the Rape Crisis Center. She acknowledged that she "probably" told people at the police precinct that the Defendant's name was "Anthony" and stated that she "was probably trying to figure it out." She said she had been confused about which abductor she

thought was named Tavaris because she had been in shock. She said, however, that she had no doubt about the Defendant's identity as the person who came to her room, walked her out of the house, and held her at gunpoint when she was forced to have oral sex with the truck's driver.

The rape victim testified that later, after she had been to the Rape Crisis Center, she started "to get her bearings" and that on the evening of March 30, 2017, she told the police the Defendant's name. She said she was afraid of the Defendant and that she had been through a "horrible thing," about which she still had nightmares. She said that the next day, she identified the Defendant in a photograph lineup. She agreed that she had misidentified the driver from a photograph lineup.

Memphis Police Detective Jesus Perea testified that, as part of an initial investigation by the Sex Crimes Unit, a black male known as "Key" and an unknown black male were identified as suspects. Detective Perea said the Defendant was identified as Key. Detective Perea said that he spoke with Mr. Kenney when Detective Perea took the rape victim to Mr. Kenney's house to retrieve some clothing and that Mr. Kenney gave him Key's cell phone number.

Detective Perea testified that Antavise White was developed as a suspect when the rape victim viewed a photograph lineup and identified the person as the abductor upon whom she was forced to perform oral sex. Detective Perea said the rape victim had been 90 to 95% confident in her identification and had stated the person she selected from the lineup "looked like" the person who raped her. Detective Perea said Mr. White was eliminated as a suspect after other officers interviewed him. Detective Perea said the rape victim viewed a second photograph lineup and identified the Defendant as the gunman.

The homicide victim's nephew testified that in March 2017, the homicide victim was employed in the construction trade and had an eight-year-old son. The homicide victim's nephew identified a photograph of the homicide victim, which was received as an exhibit.

The homicide victim's nephew testified that he first knew that something was wrong when the child's babysitter called him on "Thursday"[1] around 10:00 p.m., after the homicide victim had not picked up the child. The homicide victim's nephew said the

---

[1] This court knows that March 30, 2017 was a Thursday. *See* Tenn. R. Evid. 201 (judicial notice).

babysitter told him "what was happening." He said he drove around all night looking for the homicide victim.

Antavise White testified that the Defendant, whom he identified in the courtroom, was his best friend. Mr. White agreed that he did not want to testify and that he was present because he had been served with a subpoena. He agreed that he knew codefendant Jermarcus Thomas and that he and Mr. Thomas "look, kind of, alike." Mr. White said he did not know the victims.

Mr. White testified that on March 30, 2017, the Defendant and the codefendant came to Mr. White's house, which he said was within walking distance of Mr. Kenney's house. Mr. White said the Defendant and the codefendant "were just chilling" with him and that they did not discuss with him what they planned to do.

Mr. White agreed that he had given a statement to Sergeant Buford, in which he had said, "I was sitting in the car with myself and then Little Key came," and "Jermarcus got in the car with a gun." Other evidence showed that the Defendant was known as Little Key and that Jermarcus was codefendant Thomas. Mr. White agreed that he had said, "Little Key started talking about the lady that owed him," and "Jermarcus and Little Key talked about going to get the money." Mr. White agreed that he had told Sergeant Buford that the Defendant and the codefendant were planning to rob the "white lady" and her male relative. Mr. White agreed that he told Sergeant Buford that the Defendant and the codefendant got out of the car and walked to the Defendant's uncle's house. Mr. White agreed that he did not go with them. Mr. White acknowledged he told Sergeant Buford that the Defendant and the codefendant returned about one hour later, that they told him they robbed a white woman and a Mexican man, and that the codefendant had stated he "got some head from the white lady." Mr. White agreed that he told Sergeant Buford the codefendant had said he had put the woman in the back of "the white truck thing," but Mr. White said the codefendant had not said this and that Mr. White had learned the information from a news report. Mr. White agreed that the codefendant had stated that the woman was gone when the codefendant looked back, that the codefendant and the Defendant drove off with the man, and that the codefendant and the Defendant took the man behind a building and killed him. Mr. White said the Defendant and the codefendant stated that the Defendant had been the shooter. Mr. White agreed that he had told Sergeant Buford that the gun used had been a revolver with a brownish and white handle, but Mr. White stated he did not know if the gun had been a revolver and that he had not seen it. Mr. White acknowledged that he told Sergeant Buford the woman had owed $600 to the Defendant and that he had said to Sergeant Buford that the Defendant and the codefendant said they each had $100 "and some change" when they returned. Mr. White identified a photograph lineup he had been shown by the police and

from which he had identified the Defendant. He said the photograph he identified was of the Defendant. Mr. White identified a photograph lineup, from which he had identified the codefendant. The photograph lineups, both of which were signed by Mr. White, were received as exhibits.

Mr. White acknowledged that he had been accused of being involved in the crimes. He agreed that the police had told him he "could do [himself] a favor" by giving them information. He said that the Defendant had been like a brother to him and that he did not want to testify but that his mother told him he would be arrested if he failed to testify. He agreed that he gave his statement about one week after the crimes and that he had heard talk about the incident during this time. Mr. White agreed that he "would have said anything . . . to get out of that murder charge." He said, though, that he told the truth.

Perry Hall, Antavise White's brother, testified that he and the codefendant were friends. Mr. Hall agreed that at the time of the offenses in the present case, his brother "look[ed] a lot like" the codefendant. Mr. Hall agreed that in March 2017, he lived with Mr. White and their mother in a house within walking distance of Mr. Kenney's house.

Mr. Hall testified that on March 30, 2017, he was inside his mother's house watching television while Mr. White, the Defendant, and codefendant Thomas sat in a car outside. Mr. Hall said that at some point, the Defendant and the codefendant left to "pick up some money" from a woman who owed money to the Defendant for drugs. Mr. Hall said he learned where the Defendant and the codefendant were going from the codefendant, to whom he spoke when Mr. Hall stepped outside as the Defendant and the codefendant were leaving. Mr. Hall said he did not see a gun, but he later said he did not remember if he saw a gun. He said that when they returned, the Defendant, whom Mr. Hall knew at the time as Little Key, stated that "they killed somebody."

Mr. Hall agreed that in a prior statement, he had said that the Defendant stated the woman did not have all of the money and that the Defendant and the codefendant "ended up robbing" the woman and her male relative, killing someone, and hiding a car. Mr. Hall said the Defendant stated that the woman jumped out of the car and that the Defendant and the codefendant took the man to a back street and killed him. Mr. Hall said the Defendant and the codefendant stated that the Defendant killed the man and that the codefendant forced the woman to perform oral sex on the codefendant. Mr. Hall said the gun used was codefendant Thomas's gun, which Mr. Hall described as "an old-school western revolver gun with a white handle." Mr. Hall said he had seen the gun but did not recall if it was on March 30, 2017, or another day. Mr. Hall said the Defendant and the codefendant received about $200 in the robbery.

Mr. Hall testified that after the Defendant and the codefendant made these statements to him, the codefendant went to Mississippi to stay with the mother of his child, and the Defendant went to Atlanta. Mr. Hall identified a photograph lineup, from which he had previously identified the codefendant. The photograph lineup was received as an exhibit.

Mr. Hall testified that he made a statement to the police after learning that Mr. White was a suspect. He said the police "had the wrong person." Mr. Hall agreed that he told the police the codefendant had said the rape victim "gave him oral sex."

Unique White, who was Mr. White and Mr. Hall's sister, testified that she had known the Defendant as Mr. White's close friend. Ms. White identified a photograph lineup, which she agreed contained the Defendant's photograph. Ms. White identified the Defendant in the courtroom. Ms. White said she had known the Defendant as "Key" and had not known the Defendant's given name at the time of the offense.

Ms. White testified that the Defendant and the codefendant came to her house on March 30, 2017, to talk to her brothers. She said the Defendant and the codefendant left on foot together and did not recall at what time they were there but agreed it was "between the hours of one and five" in the afternoon. She did not know if they returned later that day. She agreed that Mr. White and Mr. Hall remained at home after the Defendant and the codefendant left on foot.

Memphis Police Lieutenant Casinghino testified that the investigation in this case began with the Sex Crimes Unit and that he became involved when it was transferred to the Homicide Unit. He said he responded to the abandoned lot where the homicide victim's body and truck were found. He said that the homicide victim's hands were bound and that the body, which showed evidence of having been shot, lay on the ground outside the truck. He said the police searched the area for witnesses. He said he spoke with Ms. Ellison. He said that fingerprint evidence was collected but that they were "of no value." He said the Defendant was located about six months later. Lieutenant Casinghino said the rape victim never identified anyone other than the Defendant as the gunman. Lieutenant Casinghino said that he did not investigate anyone named Tavaris and that no question existed as to the rape victim's identification of the Defendant as "the gunman." Lieutenant Casinghino agreed that the police did not investigate anyone other than the Defendant as the suspect who had a gun.

Jermarcus Thomas, the codefendant, testified that he was a jail inmate and that he did not have any "deals" with the State but hoped to "get something out of" his testifying.

-10-

He identified the Defendant in the courtroom. Codefendant Thomas said that he was friends with Mr. White and Mr. Hall and that he did not know anyone named Tavaris.

Codefendant Thomas testified that on March 30, 2017, he went to Mr. White and Mr. Hall's house. Codefendant Thomas said the Defendant "came over" and told him that a woman owed money to the Defendant. Codefendant Thomas said Mr. White had been present when the Defendant made the statement about getting the money but that the Defendant and codefendant Thomas did not tell Mr. White "what [they] were gonna do." Codefendant Thomas said he and the Defendant walked to the Defendant's uncle's house, where they saw a truck belonging to the male relative of the woman who owed money to the Defendant. Codefendant Thomas stated that the Defendant said, "I ain't gonna kill him." Codefendant Thomas said that he waited outside while the Defendant went inside the house for "about a minute or two."

Codefendant Thomas testified that the rape victim and the homicide victim came outside, that the Defendant gave codefendant Thomas some keys, and that codefendant Thomas drove the truck with the victims seated between himself and the Defendant. Codefendant Thomas said the Defendant had a gun and that codefendant Thomas had not given him the gun. Codefendant Thomas stated that he did not know whether the victims willingly left the house with the Defendant but acknowledged the victims did not appear to codefendant Thomas to be "free to go." Codefendant Thomas said the Defendant told him to go to the nearest automated teller machine and then told him to pull over. Codefendant Thomas said that after he pulled over, he asked the rape victim, "Can you give me some head?" He said that he acted "out of the blue" and that he was sorry for his actions. He said the rape victim was not "tied up" at this point. Codefendant Thomas said the Defendant sat in the passenger seat by the door with a gun when he asked the rape victim for oral sex. Codefendant Thomas acknowledged that the rape victim probably did not think she had a choice. He said that after the rape, the Defendant "made" him "tie her up" with a "[p]hone charger." Codefendant Thomas said the Defendant put the rape victim in the truck's camper. Codefendant Thomas said the Defendant also restrained the homicide victim with "[s]trings or something."

Codefendant Thomas testified that he drove to another location and that he did not notice the rape victim's escape from the back of the truck until he and the Defendant got out of the truck and noticed that the camper was open. Codefendant Thomas said the Defendant became frustrated. Codefendant Thomas said the homicide victim, who was intoxicated and appeared to be scared, got out of the truck and called for help. Codefendant Thomas said the homicide victim "end[ed] up getting on the ground" because "[h]e was in fear for his life." Codefendant Thomas said the homicide victim was on his knees begging for his life with the Defendant in front of the homicide victim.

Codefendant Thomas said that the Defendant did not speak, that the Defendant pointed the gun at the homicide victim's bowed head, that the homicide victim cried out, and that the Defendant fired one shot at the victim. Codefendant Thomas said he and the Defendant fled on foot. Codefendant Thomas said that he did not know what the Defendant did with the gun, that they "paid someone some gas money," and that they returned to Mr. White and Mr. Hall's house. Codefendant Thomas testified that he fled to Mississippi and that he was arrested in April. Codefendant Thomas said that the Defendant left the house on foot and that he did not know where the Defendant went.

Codefendant Thomas identified a photograph lineup containing the Defendant's photograph. Codefendant Thomas said that after his arrest, he identified the Defendant from the lineup. Codefendant Thomas said that after his arrest, he had not cooperated with the police initially but that he began cooperating on April 10 after he learned that Mr. White and Mr. Hall "told on" him. Codefendant Thomas said he gave a statement in which he admitted the same information to which he was now testifying.

Codefendant Thomas denied that the gun the Defendant used during the offenses belonged to codefendant Thomas. Codefendant Thomas said that if Mr. White and Mr. Hall claimed to have seen codefendant Thomas with the gun before the date of the offenses, they were lying.

The defense did not offer evidence.

After receiving the evidence, the jury found the Defendant guilty of first degree premeditated murder, first degree felony murder committed in the perpetration of a kidnapping, aggravated robbery, two counts of especially aggravated kidnapping, and aggravated rape. The trial court merged the two first degree murder convictions and imposed a life sentence for first degree murder. The court conducted a sentencing hearing and imposed a ten-year sentence for aggravated robbery and twenty-year sentences for each of the remaining offenses, to be served concurrently with each other and with the first degree murder sentence. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions for first degree premeditated murder, first degree felony murder, especially aggravated kidnapping of the homicide victim, and aggravated rape. He does not challenge the sufficiency of the evidence to support his convictions for especially aggravated

kidnapping of the rape victim and aggravated robbery.  The State counters that the evidence is sufficient to support the convictions.  We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Identity of the perpetrator is an essential element of any crime."  *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006).  Circumstantial evidence alone may be sufficient to establish the perpetrator's identity.  *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).  The identity of the perpetrator is a question of fact for the jury to determine.  *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005).  "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'"  *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

## A.  First Degree Premeditated Murder

The Defendant argues that the State failed to prove that he premeditated the killing of the homicide victim.  He also argues that the evidence is insufficient because codefendant Thomas was an accomplice whose testimony was not adequately corroborated.

As relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another.  T.C.A. §§ 39-13-201 (2018), 39-13-202(a)(1) (2014) (subsequently amended).  In the context of first degree murder, intent is shown if the

-13-

codefendant has the conscious objective or desire to cause the victim's death.   T.C.A. §
39-11-302(a) (2018) (defining intentional as the "conscious objective or desire to engage
in the conduct or cause the result"); *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim.
App. 2002).  A premeditated act is one which is

> done after the exercise of reflection and judgment.  "Premeditation" means
> that the intent to kill must have been formed prior to the act itself.  It is not
> necessary that the purpose to kill preexist in the mind of the accused for any
> definite period of time.  The mental state of the accused at the time the
> accused allegedly decided to kill must be carefully considered in order to
> determine whether the accused was sufficiently free from excitement and
> passion as to be capable of premeditation.

T.C.A. § 39-13-202(d).  The question of whether a defendant acted with premeditation is
a question of fact for the jury to be determined from all of the circumstances surrounding
the killing.   *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003).   Proof of
premeditation may be shown by direct or circumstantial evidence.  *State v. Brown*, 836
S.W.2d 530, 541 (Tenn. 1992).  As a result, the jury "may infer premeditation from the
manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn.
2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008).

"An accomplice is defined as a person who knowingly, voluntarily and with
common intent unites with the principal offender in the commission of the crime." *State
v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867
S.W.2d 1, 7 (Tenn. Crim. App. 1992)).  "[A] conviction may not be based solely upon the
uncorroborated testimony of an accomplice." *See, e.g.*, *State v. Shaw*, 37 S.W.3d 900,
903 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*,
379 S.W.2d 34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411
S.W.3d 886 (Tenn. 2013).   In order for accomplice testimony to be adequately
corroborated:

> there must be some fact testified to, entirely independent of the
> accomplice's testimony, which, taken by itself, leads to the inference, not
> only that a crime has been committed, but also that the defendant is
> implicated in it; and this independent corroborative testimony must also
> include some fact establishing the defendant's identity.  This corroborative
> evidence may be direct or entirely circumstantial, and it need not be
> adequate, in and of itself, to support a conviction; it is sufficient to meet the
> requirements of the rule if it fairly and legitimately tends to connect the

defendant with the commission of the crime charged.  It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bigbee*, 885 S.W.2d at 803 (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citations omitted)); *see Shaw*, 37 S.W.3d at 903.

Regarding the question of whether a person is an accomplice, the term "accomplice" does not include a person who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related but distinct offense.  To be an accomplice, a person must perform some act or take some part in the commission of the crime or owe some duty to the person in danger that makes incumbent on him to prevent its commission.  An accomplice is "one culpably implicated in, or who unlawfully co-operates, aids, abets, or assists in, the commission of the crime charged." The generally accepted test as to whether a witness is an accomplice is whether he himself could have been convicted for the offense, either as principal or accessory. *Pennington v. State*, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971) (quoting 2 *Wharton's Criminal Evidence* § 448 (12th ed. 1955)).  A person is not deemed an accomplice simply because he or she was present at the crime scene.  *Letner v. State*, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974); *Hicks v. State*, 149 S.W. 1055, 1056 (Tenn. 1912).

The Defendant's argument that the State offered insufficient evidence to prove premeditation discounts the evidence that he used a gun to shoot a bound and unarmed victim in the head while the homicide victim was crouched on his knees in fear and begging for his life, that the Defendant callously disregarded the homicide victim's pleas, that the Defendant shot the homicide victim after committing other crimes against the two victims and after the rape victim's escape, and that the Defendant fled the scene and later fled the state after the killing.  The Defendant's argument overlooks the evidence that he planned to go to the rape victim's home to collect money he was owed, that he ushered the victims out of the home at gunpoint, that he directed codefendant Thomas regarding where to drive, and that he bound the homicide victim's hands to restrain him.

Regarding the corroboration of accomplice testimony, we agree with the Defendant that codefendant Thomas was an accomplice.  Indeed, the State does not contend otherwise.  The evidence which corroborates the codefendant's testimony includes the following:  The medical examiner testified that the homicide victim's gunshot wound was consistent with the homicide victim's having been in a kneeling position and the bullet having followed a downward trajectory.  Investigator Brown identified the cloth used to bind the homicide victim's hands.  The rape victim testified that her and the homicide victim's hands were bound, and Ms. Jones testified that she

observed marks on the rape victim's arms and wrists that appeared to be from bindings. The rape victim testified about the robbery and abduction at Mr. Keeney's house and the events in the homicide victim's truck until her escape, and her account corroborated the codefendant's testimony. Mr. Kenney identified the Defendant as the person with whom the victims left Mr. Kenney's house. Mr. White acknowledged that the Defendant and the codefendant told him before the crimes that they were going to rob the victims and that the Defendant and the codefendant admitted to him shortly after the crimes that they had completed the robbery and a rape. Mr. Hall testified that the Defendant and the codefendant discussed a plan to "pick up some money" from a woman who owed the Defendant for drugs and that shortly after the crimes, the Defendant admitted that the rape victim had jumped out of the truck and that the Defendant said he and the codefendant took the homicide victim behind a building and killed the homicide victim.

Notwithstanding the wealth of evidence to corroborate the codefendant's testimony, the defense argues that no corroboration exists to show premeditation. As we have stated, every component of an accomplice's testimony need not be corroborated. *See Bigbee*, 885 S.W.2d at 803. Corroboration is sufficient if it fairly and legitimately connects a defendant to the commission of the crime. *Id.* In any event, much of the evidence which tended to show premeditation was proof other than the codefendant's testimony.

The evidence is sufficient to support the Defendant's conviction of first degree premeditated murder.

### B. & C. First Degree Felony Murder in the Perpetration of Kidnapping and Especially Aggravated Kidnapping of the Homicide Victim

In related arguments, the Defendant theorizes that the evidence is insufficient to support his especially aggravated kidnapping conviction of the homicide victim because the kidnapping was incidental to the robbery and was not a separate crime. As a result, he posits, his felony murder conviction must fail because it was based upon the predicate felony of kidnapping.

As relevant to this appeal, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping[.]" T.C.A. § 39-13-202(a)(2) (2018) (subsequently amended). "Kidnapping is false imprisonment as defined in § 39-13-302, under circumstances exposing the other person to substantial risk of bodily injury." *Id.* § 39-13-303(a) (2018). False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere with the other's liberty." *Id.* § 39-13-302(a) (2018).

"Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon or by the display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" *Id*. § 39-13-305(a) (2018).

The Defendant's argument regarding the kidnapping being incidental to, and not a separate crime from, the robbery is premised upon *State v. White*, 362 S.W.3d 559, 562 (Tenn. 2012). In *White*, our supreme court delineated a new method for determining whether dual convictions for a kidnapping-related offense and another felony offense are permissible pursuant to due process principles. The court determined that a separate due process inquiry was unnecessary and concluded that a proper jury instruction in conjunction with appellate review of sufficiency of the evidence satisfied due process principles. *White*, 362 S.W.3d. at 577-78; *see State v. Cecil*, 409 S.W.3d 599, 609 (Tenn. 2013) ("Only when the jury is properly instructed can appellate review of the sufficiency of the convicting evidence satisfy the due process safeguard."). The *White* instruction requires a trial court to provide a jury instruction "defin[ing] the key element [of the kidnapping-related offense] – the substantial interference with the victim's liberty – as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." *White*, 362 S.W.3d at 580. The *White* jury instruction was not given in the present case, and we will consider in Section II below whether the Defendant, who did not request the instruction or object to its absence at the trial level, is entitled to relief as a matter of plain error. Nevertheless, the principles in *White* remain relevant to our consideration of the sufficiency of the evidence for the especially aggravated kidnapping conviction.

In *White*, the supreme court delineated several non-exclusive factors which inform the inquiry into whether kidnapping has occurred, separately from another felony:

• the nature and duration of the victim's removal or confinement by the defendant;

• whether the removal or confinement occurred during the commission of the separate offense;

• whether the interference with the victim's liberty was inherent in the nature of the separate offense;

-17-

• whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

*White*, 362 S.W.3d at 580-81.

The Defendant argues that the robbery was still in progress, despite his having taken money from the homicide victim in the rape victim's room at Mr. Kenney's house, because he and the codefendant were taking the victims to an automated teller machine in order for the homicide victim to obtain more money. Thus, he contends that the kidnapping was incidental to the ongoing robbery.

The evidence viewed in the light most favorable to the State shows that the armed Defendant took money from the homicide victim while in the rape victim's room, that he obtained the homicide victim's truck keys and gave them to the codefendant, and that he forced the victims out of the house and into the homicide victim's truck. The victims were seated in the center of the truck, with the Defendant and the codefendant blocking the doors and the Defendant continuing to hold a gun. The codefendant bound the rape victim's hands, and the Defendant bound the homicide victim's hands. After the codefendant forced the rape victim to perform oral sex while the Defendant continued to hold the gun and after she eventually escaped from the back of the truck, the Defendant and the codefendant took the homicide victim to a vacant lot behind a building, where the Defendant executed the homicide victim as he begged for his life.

Our supreme court considered similar facts in *State v. Alston*, 465 S.W.3d 555 (Tenn. 2015). In *Alston*, the defendants robbed the victim of her purse at gunpoint as she attempted to get into a car outside her home. *Alston*, 465 S.W.3d at 566. The defendants then demanded that the victim go into her house, where they confined her as they ransacked her home. *Id.* The defendants were charged with, and convicted of, aggravated robbery related to their taking of the purse. *Id.* at 567. For the events inside the house, they were charged with, and convicted of, especially aggravated kidnapping, aggravated burglary, and firearms offenses, but they were not charged with an additional

-18-

robbery offense. *See id.* The trial court did not give the *White* instruction, and defendants argued on appeal that the robbery had been ongoing from the taking of the purse through the events inside the house, meaning that the confinement of the victim had been incidental to the ongoing robbery. *Id.* Rejecting this theory, the supreme court reasoned that the aggravated robbery was completed upon the defendants' taking the victim's purse. *See id.* The court noted that the indictment specified that the robbery related "only to 'the tak[ing] . . . of [the victim's] . . . purse and its contents.'" *See id.* Thus, the court reasoned that the kidnapping had been beyond the conduct necessary to accomplish the robbery. *See id.*

In the present case, the facts show that the removal and confinement continued long after the Defendant robbed the homicide victim of money and the truck, the events specified in the aggravated robbery count of the indictment. The facts also show that the events in the truck included the especially aggravated kidnapping and aggravated rape of the rape victim, which were separate offenses from the robbery and kidnapping of the homicide victim and which did not require a kidnapping of the homicide victim in order for the Defendant to have accomplished. Confinement of the homicide victim, beyond the events in the rape victim's room at Mr. Kenney's house, was not necessary to accomplish the robbery involving the money and the truck. The removal from Mr. Kenney's house and the confinement in the truck prevented the homicide victim from summoning help, reduced the Defendant's risk of detection, and increased the danger and risk of harm to the homicide victim. *See id.* The evidence is sufficient to show that the Defendant committed especially aggravated kidnapping of the homicide victim and that his removal or confinement was not essentially incidental to the robbery. *See id.* at 580.

Thus, we turn to the question of sufficiency of the evidence to support the conviction for felony murder in the perpetration of kidnapping. Viewed in the light most favorable to the State, the evidence shows that the Defendant armed himself with a gun and went to the rape victim's home to take money. Once there, he demanded money from the homicide victim, who surrendered his wallet and truck keys. The armed Defendant forced the victims into the homicide victim's truck, which the codefendant drove, stopping long enough for the codefendant to demand oral sex from the rape victim, restraining the victims by binding their hands, and eventually taking the homicide victim to an isolated area and fatally shooting him after the rape victim had escaped from the truck's camper compartment. The evidence is sufficient to support the Defendant's felony murder conviction.

## D. Aggravated Rape

The Defendant argues that the evidence is insufficient to support his aggravated rape conviction because the proof failed to show that he was criminally responsible for codefendant Thomas's actions.

At the time of the offense, aggravated rape was defined, in relevant part, as follows:

> (a) Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:
>
> > (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon;
> >
> > (2) The defendant causes bodily injury to the victim;
> >
> > (3) The defendant is aided or abetted by one (1) or more other persons; and
> >
> > (A) Force or coercion is used to accomplish the act[.]

T.C.A. § 39-13-502(a) (2018) (subsequently amended). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital . . . openings of the victim's . . . body, but emission of semen is not required[.]'' *Id.* § 39-13-501(7) (2018).

"Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another." *Dorantes*, 331 S.W.3d at 386 (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)).

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> . . .

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402 (2018). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994).

Viewed in the light most favorable to the State, the evidence shows that the Defendant and the codefendant confined the victims inside the truck, with the Defendant and the codefendant seated by the doors. The Defendant held a gun. The codefendant asked the rape victim for oral sex, and he acknowledged the rape victim probably did not think she had a choice. After the rape, the Defendant told the codefendant to bind the rape victim's hands, and the Defendant confined the rape victim in the camper in the back of the truck. These actions show that the Defendant intended to assist or promote the codefendant's commission of a rape and that the Defendant aided and directed the codefendant in the crime. *See* T.C.A. § 39-11-402. Thus, the Defendant "knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *See Dorantes*, 331 S.W.3d at 386. The evidence is sufficient to support the Defendant's aggravated rape conviction under a theory of criminal responsibility.

## II

### Failure to Give the *State v. White* Jury Instruction

The Defendant contends that the trial court erred in failing to give the *State v. White* instruction referenced in section I above. He acknowledges that the issue was not raised at the trial or in the motion for a new trial but seeks relief as a matter of plain error. The State responds that the Defendant has waived the issue and that relief is not required to do substantial justice.

A criminal defendant has "a right to a correct and complete charge of the law." *Hanson*, 279 S.W.3d at 280 (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *Dorantes*, 331 S.W.3d at 390); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975).

-21-

The pattern jury instruction modeled after *White* provides as follows:

To find the defendant guilty of this offense, you must also find beyond a reasonable doubt that the removal or confinement was to a greater degree than that necessary to commit the offense(s) of as charged *[or included]* in count(s). In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:

(a)     the nature and duration of the alleged victim's removal or confinement by the defendant;

(b)     whether the removal or confinement occurred during the commission of the separate offense;

(c)     whether the interference with the alleged victim's liberty was inherent in the nature of the separate offense;

(d)     whether the removal or confinement prevented the alleged victim from summoning assistance, although the defendant need not have succeeded in preventing the alleged victim from doing so;

(e)     whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

(f)     whether the removal or confinement created a significant danger or increased the alleged victim's risk of harm independent of that posed by the separate offense.

Unless you find beyond a reasonable doubt that the alleged victim's removal or confinement exceeded that which was necessary to accomplish the alleged and was not essentially incidental to it, you must find the defendant not guilty of especially aggravated kidnapping.

T.P.I.—Crim. 8.03 (25th ed. 2021) (Especially aggravated kidnapping) (footnotes omitted).

Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also State v. Minor*, 546 S.W.3d 59, 70 (Tenn. 2018). All five factors must exist in order for plain error to be recognized. *Smith*, 24 S.W.3d at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

Our analysis begins with the Defendant's argument that the State has the burden to show that the failure to give the instruction was harmless beyond a reasonable doubt, to which the State counters that the Defendant bears the burden to show that the alleged error was of a magnitude that it probably changed the outcome of the trial. To support his position, the Defendant argues that the *White* instruction is fundamental; thus, the relevant inquiry is whether the State has shown that the trial court's error in failing to give the instruction was harmless beyond a reasonable doubt. He relies upon *Cecil*, 409 S.W.3d at 610, and *Alston*, 465 S.W.3d at 565, both of which involved plenary review, not plain error review, of the lack of the *White* instruction. The State, on the other hand, relies upon the well-settled principle that when a defendant seeks relief as a matter plain error, "the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial." *See State v. Hester*, 324 S.W.3d 1, 56 (Tenn. 2010). Thus, plenary review involves analysis of whether the absence of the *White* instruction was harmless beyond a reasonable doubt, whereas review for plain error regarding the absence of a *White* instruction places the burden on the Defendant to show that all of the *Adkisson* factors exist relative to the absence of the instruction at his trial. *See State v. Antoine Hinton*, No. W2018-01931-CCA-R3-CD, 2020 WL 1426683, at *10-11 (Tenn. Crim. App. Mar. 19, 2020) (conducting plain error review where the trial court did not give the *White* instruction and the defendant failed to raise the issue in the trial court but raised it on appeal), *perm. app. denied* (Tenn. Sept. 21, 2020); *State v. Gary S. Holman*, No. E2012-01143-CCA-R3-CD, 214 WL 295610, at *12 (Tenn. Crim. App. Jan. 27,

2014) (conducting plain error review of the lack of a *White* instruction in a case in which the issue had not be raised in the trial court or on appeal), *perm. app. denied* (Tenn. July 29, 2015).

In the present case, the record clearly establishes that the *White* instruction was not given and that the failure to give the instruction was a breach of a clear and unequivocal rule of law. *See Smith*, 24 S.W.3d at 282; *Adkisson*, 899 S.W.2d at 641-42; *see also White*, 362 S.W.3d at 562. The record does not show that the Defendant waived the issue for tactical reasons. *See Smith*, 24 S.W.3d at 282; *Adkisson*, 899 S.W.2d at 641-42. The facts showed that the Defendant robbed the homicide victim of money and a truck, after which he confined the homicide victim to the truck and engaged in further criminal activity. The evidence shows unequivocally that the removal of the homicide victim from the rape victim's room and subsequent confinement in the truck were unnecessary to accomplish the robbery. *Cf. White*, 362 S.W.3d at 579 (focusing on whether the proof could be interpreted in different ways regarding whether the removal or confinement of a victim was a substantial interference with the victim's liberty and therefore a question of fact for the jury's consideration). Given the strength of the evidence presented at the trial regarding the separate offense of especially aggravated kidnapping of the homicide victim, we conclude that, although the trial court erred in failing to give the *White* instruction, no substantial right of the Defendant was adversely affected and that consideration of the error is not necessary to do substantial justice. *See Smith*, 24 S.W.3d at 282; *Adkisson*, 899 S.W.2d at 641-42. Plain error relief is not required.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE